**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| KENNETH KITSON, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL NO. 06-528-GPM |
| THE BANK OF EDWARDSVILLE and HARLAND FINANCIAL SOLUTIONS, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This matter is before the Court on the motion to remand brought by Plaintiff Kenneth Kitson, individually and on behalf of others similarly situated (Doc. 14). For the following reasons, Kitson's motion is **GRANTED**.

## INTRODUCTION

This case is a class action commenced in state court that has come to this Court via removal. The record of the state-court proceedings that is before the Court is incomplete, but the following facts concerning the procedural history of the case seem not to be in dispute. Kitson originally filed this action in 2002 against Defendant Bank of Edwardsville ("BOE") in the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois, on behalf of himself and a putative class of borrowers of commercial loans from BOE, alleging that the bank improperly calculated interest on such loans. Kitson's second amended complaint (Doc. 2, Ex. A, Pt. 2), which appears to be the operative complaint in this case, asserts the following claims for relief against BOE: violation of

the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 – 505/12 ("ICFA"); breach of contract; violation of the Illinois Interest Act, 815 ILCS 205/0.01 – 815 ILCS 205/11, and the Illinois Promissory Note and Bank Holiday Act, 815 ILCS 105/0.01 – 815 ILCS 105/16; and declaratory judgment.  In 2003 the case was certified as a class action in state court.  In June 2006 Kitson amended his complaint to join Defendant Harland Financial Solutions, Inc. ("HFS"), a company that licenses computer software called Laser Pro used by BOE to generate loan documents, alleging that HFS aided and abetted BOE's unlawful conduct (Doc. 2, Ex. A, Pt. 46).  Within thirty days after service of the amended complaint, HFS removed the case to this Court, asserting federal subject matter jurisdiction in diversity pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) ("CAFA").  Kitson in turn has moved for remand of the case to state court.  Having reviewed carefully the submissions of the parties and conducted a hearing on Kitson's motion for remand, the Court now is prepared to rule.

## DISCUSSION

### A.      Legal Standard

Removal of actions from state court to federal court is governed by 28 U.S.C. § 1441, which provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).  In other words, "[a] defendant may remove a case to federal court only if the federal district court would have original subject matter jurisdiction over the action." *Disher v. Citigroup Global Mkts. Inc.*, 419 F.3d 649, 653 (7th Cir. 2005), *vacated on other grounds*,

126 S. Ct. 2964 (2006). The defendant has the burden of establishing that an action is removable, and doubts concerning removal must be resolved in favor of remand to state court. *See Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005); *Boyd v. Phoenix Funding Corp.*, 366 F.3d 524, 529 (7th Cir. 2004); *Fiore v. First Am. Title Ins. Co.*, No. 05-CV-474-DRH, 2005 WL 3434074, at *2 (S.D. Ill. Dec. 13, 2005). *Cf. Prime Care of N.E. Kan., LLC v. Blue Cross & Blue Shield of Kan. City*, Civil Action No. 05-2227-KHV, 2006 WL 2734469, at *1 (D. Kan. Sept. 25, 2006); *Beegal v. Park W. Gallery*, Civil No. 05-5625 (RBK), 2006 WL 2645123, at **1-2 (D.N.J. Sept. 14, 2006).

### B. Subject Matter Jurisdiction under CAFA

As an initial matter, because the parties dispute whether federal subject matter jurisdiction is proper in this case under CAFA, the Court must determine whether the jurisdictional prerequisites of CAFA are satisfied in this case so as to make the case removable to federal court under the statute. Pursuant to CAFA, federal courts have jurisdiction in diversity over class actions with one hundred or more class members, *see* 28 U.S.C. § 1332(d)(5)(B), in which any member of the plaintiff class is a citizen of a state different from that of any defendant, or any member of a plaintiff class or any defendant is a foreign state or a citizen or subject of a foreign state. *See* 28 U.S.C. § 1332(d)(2). In a class action in which CAFA's requirement of minimal diversity is met, a federal court has jurisdiction if, after aggregating class members' claims, more than $5 million, exclusive of interest and costs, is in controversy. *See* 28 U.S.C. § 1332(d)(2), (d)(6). Class actions filed in state court that satisfy the jurisdictional prerequisites of CAFA are subject to removal to federal court. *See* 28 U.S.C. § 1453(b), (c). Although CAFA is not retroactive and does not permit removal of class actions filed in state court before the effective date of the statute, February 18, 2005, *see*

*Schillinger v. 360Networks USA, Inc.*, Civil No. 06-138-GPM, 2006 WL 1388876, at *2 (S.D. Ill.

May 18, 2006) (citing Pub. L. 109-2, § 9, 119 Stat. 4), a party defendant joined after the effective

date of the statute in a class action that satisfies the jurisdictional prerequisites of CAFA may

remove the case to federal court. *See* 28 U.S.C. § 1453(b) ("A class action may be removed to a

district court of the United States in accordance with [28 U.S.C. §] 1446 . . . by any defendant

without the consent of all defendants."). *See also Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330,

333 (7th Cir. 2005) (quoting *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 749 (7th Cir. 2005))

("[A] defendant added after February 18[, 2005] could remove because suit *against it* would have

been commenced after the effective date [of CAFA]") (emphasis in original).[1]

_____

1.    As 28 U.S.C. § 1453(b) makes clear, CAFA repeals the traditional "unanimity rule" governing removal, that is, the principle that unless all defendants properly joined and served when a case is removed consent to the removal, such removal is procedurally defective. *See Northern Ill. Gas Co. v. Airco Indus. Gases, Div. of Airco, Inc.*, 676 F.2d 270, 272 (7th Cir. 1982); *P.P. Farmers' Elevator Co. v. Farmers Elevator Mut. Ins. Co.*, 395 F.2d 546, 547-48 (7th Cir. 1968); *Production Stamping Corp. v. Maryland Cas. Co.*, 829 F. Supp. 1074, 1076 & n.1 (E.D. Wis. 1993).   A corollary of the unanimity rule is the so-called "first-served defendant" rule, which holds that a defendant's failure to remove operates as a waiver of the right to remove as to all later-served defendants, on the theory that the first-served defendant's failure to remove deprives that defendant of the ability to consent to removal, thus defeating the requisite unanimity. *See Graft v. Alcoa*, No. 1:02-CV-01848-JDT-TA, 2003 WL 1984347, at **4-5 (S.D. Ind. Apr. 4, 2003); *Auchinleck v. Town of LaGrange*, 167 F. Supp. 2d 1066, 1068 (E.D. Wis. 2001); *Phoenix Container, L.P. v. Sokoloff*, 83 F. Supp. 2d 928, 932-33 (N.D. Ill. 2000); *Higgins v. Kentucky Fried Chicken*, 953 F. Supp. 266, 268 (W.D. Wis. 1997); *Ortiz v. General Motors Acceptance Corp.*, 583 F. Supp. 526, 529 (N.D. Ill. 1984).   Because under CAFA a class action subject to the statute may be removed thirty days from the date a defendant is served, with or without the consent of other defendants, the statute abrogates both the unanimity rule and the first-served defendant rule. *See Frazier v. Pioneer Ams. LLC*, 455 F.3d 542, 546-47 & n.18 (5th Cir. 2006); *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006); *Schillinger*, 2006 WL 1388876, at **6-7; *Yescavage v. Wyeth, Inc.*, No. 205CV294FTM33SPC, 2005 WL 2088429, at *1 (M.D. Fla. Aug. 30, 2005). *Cf. Plourde v. Ferguson*, 519 F. Supp. 14, 16-17 (D. Md. 1980) (removal pursuant to 28 U.S.C. § 1442, governing removal by federal officers, was timely where a defendant properly removed the case within thirty days of receipt of the initial pleading in the case, notwithstanding the fact that an earlier-served defendant failed to effect timely removal; section 1442 does not require unanimity of parties to effect removal).

In this case the record before the Court clearly establishes that CAFA's jurisdictional prerequisites are satisfied.  Kitson is an Illinois citizen, while HFS is an Oregon citizen, so that minimal diversity of citizenship exists in this case.  As to the size of the class, BOE has furnished evidence, specifically, a spreadsheet of borrowers of commercial loans during the class period filed under seal, showing that this case involves interest on some nine thousand loans made by BOE in the relevant time.  Even allowing for the fact that some borrowers in the class hold multiple loans from BOE, it is apparent from the information furnished by BOE that the class easily exceeds one hundred or more persons.  Further, the evidence submitted by BOE shows that the interest on the loans extended to class members totals at a minimum approximately $171 million, so that the potential class recovery under the Illinois Interest Act, *see* 815 ILCS 205/6, readily surpasses in the aggregate the $5 million jurisdictional minimum amount for CAFA purposes.

Although Kitson argues that the evidence submitted by BOE as to the size of the class and the amount in controversy in this case is not properly before the Court because it should have been submitted as an exhibit to HFS's notice of removal, Kitson is clearly wrong.  It is true that the existence of federal subject matter jurisdiction must be assessed as of the time a case is removed from state court, *see Chase v. Shop 'N Save Warehouse Foods, Inc.*, 110 F.3d 424, 430 (7th Cir. 1997); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993); *In re Shell Oil Co.*, 966 F.2d 1130, 1132 (7th Cir. 1992); *In re Amoco Petroleum Additives Co.*, 964 F.2d 706, 707-09 (7th Cir. 1992), but to ascertain the existence of such jurisdiction a court is entitled to consider any "evidence [that] sheds light on the situation which existed when the case was removed." *Harmon v. OKI Sys.*, 115 F.3d 477, 479-80 (7th Cir. 1997) (considering post-removal interrogatories to evaluate whether federal subject matter jurisdiction existed when a case was removed). *See also Cassens v. Cassens*,

430 F. Supp. 2d 830, 834 n.2 (S.D. Ill. 2006) ("[A] court is entitled to consider all facts that shed light on the existence of subject matter jurisdiction."); *International Test & Balance, Inc. v. Associated Air & Balance Council*, No. 98 C 2553, 1998 WL 957332, at *2 (N.D. Ill. Dec. 23, 1998) (quoting *Harmon*, 115 F.3d at 480) ("The court may review evidence not included in the record at the time of removal if that evidence 'sheds light on the situation which existed when the case was removed.'").   In this instance HFS's notice of removal properly invoked the jurisdictional prerequisites of CAFA, that is, minimal diversity of citizenship, a class of at least one hundred persons, and an amount in controversy worth in the aggregate more than $5 million, exclusive of interest and costs, and the evidence submitted by BOE simply confirms beyond peradventure that CAFA's jurisdictional prerequisites were met at the time this case was removed.

Finally, the Court rejects Kitson's argument that this case is not removable because his amended complaint does not assert class-action claims against HFS.   First, this argument is disingenuous.   Kitson's amendment to his second amended complaint to join HFS unmistakably asserts a classwide claim against the company and implicitly incorporates by reference the class-action allegations of the second amended complaint.   Second, Kitson's argument is simply wrong.   As discussed, CAFA provides that "[a] class action may be removed to a district court of the United States[.]"  28 U.S.C. § 1453(b).   The clear language of the statute permits the removal of a "class action," regardless of whether specific claims asserted in the action are removable or not. *See Braud v. Transport Serv. Co. of Ill.*, 445 F.3d 801, 808 (5th Cir. 2006) (under CAFA, "it is the 'action,' not claims against particular defendants, that is removable[.]"); *Moniz v. Bayer A.G.*, 447 F. Supp. 2d 31, 36 (D. Mass. 2006) (voluntary dismissal of a defendant who has removed a case under CAFA does not defeat federal subject matter jurisdiction, because removal under CAFA

effects removal of the entire case, not merely the claims against the removing defendant); *Werner v. KPMG LLP*, 415 F. Supp. 2d 688, 696 n.10 (S.D. Tex. 2006) (same); *Dinkel v. General Motors Corp.*, 400 F. Supp. 2d 289, 294 (D. Me. 2005) ("The plain language of CAFA makes clear that any single defendant can remove without the consent of other defendants and that it is the entire lawsuit that is removed, not merely the claims against that defendant.").  To hold otherwise would amount to a reintroduction of the doctrine of separate and independent claims into removal of diversity cases, something that clearly is a legislative, not a judicial, prerogative.  *See* 28 U.S.C. § 1441(c) (permitting removal of separate and independent claims only where such claims arise under federal law); *Allsup v. Liberty Mut. Ins. Co.*, 782 F. Supp. 325, 327-28 (N.D. Tex. 1991) (noting the amendment of 28 U.S.C. § 1441 in 1990 to exclude removal of separate and independent claims in diversity).  *See also Smallwood v. Illinois Cent. R.R. Co.*, 385 F.3d 568, 576 (5th Cir. 2004) (amendment of the removal statutes is the province of Congress, not the federal judiciary).  The Court concludes that this case is properly before it pursuant to CAFA.

## C.    Abstention under CAFA

Having determined that this case is subject to removal under CAFA, the Court turns to the central issue presented by Kitson's motion for remand, namely, whether the Court is required under CAFA to abstain from hearing this case.  At issue here are the provisions of 28 U.S.C. § 1332(d)(4), which states, in pertinent part:

> A district court shall decline to exercise jurisdiction under paragraph (2) –
> (A)(i) over a class action in which –
> (I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
> (II) at least 1 defendant is a defendant –
> (aa) from whom significant relief is sought by members of the plaintiff class;
> (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

(cc) who is a citizen of the State in which the action was originally filed; and
(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and
(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or
(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

28 U.S.C. § 1332(d)(4).   The provisions of 28 U.S.C. § 1332(d)(4)(A) and 28 U.S.C. § 1332(d)(4)(B) are known, respectively, as the "local controversy" exception and the "home-state controversy" exception to the exercise of federal diversity jurisdiction under CAFA.[2]   The

---

2.   CAFA also contains a provision for discretionary abstention from the exercise of jurisdiction under the statute, known as the "interests of justice" exception, which provides:

A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of –
(A) whether the claims asserted involve matters of national or interstate interest;
(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;
(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;
(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;
(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and
(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

28 U.S.C. § 1332(d)(3). Because Kitson has not argued that the interests of justice exception applies in this case, the Court does not consider the applicability of the exception in this instance.

United States Court of Appeals for the Seventh Circuit recently clarified that a plaintiff seeking remand to state court bears the burden of proving the applicability of the local controversy exception and the home-state exception in a given case. *See Hart v. FedEx Ground Package Sys. Inc.*, 457 F.3d 675, 679-82 (7th Cir. 2006). *Cf. Frazier*, 455 F.3d at 546; *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164-65 (11th Cir. 2006). Kitson contends that both the local controversy exception and the home-state exception apply in this case.

### 1. Waiver

Before turning to the issue of whether abstention is required in this case, the Court addresses briefly HFS's contention that Kitson has waived his right to seek abstention by pursuing discovery in this Court pending resolution of the issue of remand. The Court does not agree. The doctrine of waiver of the right to seek remand is a judicially-crafted one that has its origins in the fact that, before 1988, 28 U.S.C. § 1447 contained no time limit on seeking remand by reason of a procedural, rather than jurisdictional, defect in removal, providing only that, "[i]f at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case." *Thompson v. Louisville Ladder Corp.*, 835 F. Supp. 336, 339 (E.D. Tex. 1993) (quoting the pre-1988 text of 28 U.S.C. § 1447(c)) (emphasis omitted). As amended in 1988 by the Judicial Improvements and Access to Justice Act, section 1447(c) now reads: "A motion to remand the case on the basis of any defect in removal procedure must be made within 30 days after the filing of the notice of removal under section 1446(a). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). By creating a strict thirty-day period to seek remand based on a procedural defect in removal, the amended statute eliminates the basis for the waiver doctrine.

Further, assuming the waiver doctrine has continuing validity, the Court does not find that a waiver has occurred on the facts of this case.

Following removal of this case, Kitson moved promptly for remand to state court, and he has not given any indication that he consents to the adjudication of this case by this Court. *See Benjamin v. Natural Gas Pipeline Co. of Am.*, 793 F. Supp. 729, 733 (S.D. Tex. 1992) (the plaintiffs did not waive their right to seek remand of their claims based on a procedural defect in removal by filing a jury demand and an amended complaint: "The Plaintiffs' conduct, viewed in its totality, clearly shows that they have not resigned themselves to litigating this case in federal court."). "[M]erely engaging in offensive or defensive litigation (such as limited discovery) especially when the plaintiff has already filed a motion for remand, does not forfeit the right to a remand." *Lapoint v. Mid-Atlantic Settlement Servs., Inc.*, 256 F. Supp. 2d 1, 3 (D.D.C. 2003) (citing *Medlin v. Andrew*, 113 F.R.D. 650, 652 (M.D.N.C. 1987)). *See also American Home Assurance Co. v. Insular Underwriters Corp.*, 494 F.2d 317, 319-20 (1st Cir. 1974) (finding that there was no waiver of the right to seek remand, notwithstanding an interval of three years between removal and remand, where the plaintiff promptly sought remand and the case had not progressed toward a final disposition). The Court notes that in *Hart*, though the Seventh Circuit did not address the precise issue of waiver of the right to seek abstention under CAFA, the court specifically held that a plaintiff has a right to seek abstention not only at the time a case is removed under CAFA but later in the case as well, if ongoing discovery reveals the necessity of abstention. *See* 457 F.3d at 682. This portion of *Hart*'s holding suggests that merely participating in discovery in federal court does not constitute a waiver of the right to seek abstention under CAFA. In sum, the Court concludes that Kitson has not waived his right to demand abstention under CAFA.

2.      **Local Controversy Exception**

Under the local controversy exception, as discussed, a district court must decline to exercise jurisdiction over a class action if a plaintiff proves all of the following elements:  (1) greater than two-thirds of the "members of all proposed plaintiff classes in the aggregate" are citizens of the state in which the action was originally filed, 28 U.S.C. § 1332(d)(4)(A)(i)(I); (2) at least one defendant is a defendant from whom "significant relief" is sought, whose alleged conduct "forms a significant basis for the claims" asserted, and "who is a citizen of the State in which the action was originally filed," 28 U.S.C. § 1332(d)(4)(A)(i)(II)(aa)-(cc); (3) the "principal injuries" resulting from the "alleged conduct or any related conduct of each defendant were incurred in the state in which the action was originally filed," 28 U.S.C. § 1332(d)(4)(A)(i)(III); and (4) no other class action has been filed against any of the defendants asserting the "same or similar factual allegations" during the three-year period preceding the filing of the class action.  28 U.S.C. § 1332(d)(4)(A)(ii).  At issue in this case are whether more than two-thirds of the class are citizens of Illinois and whether the principal injuries complained of were incurred in Illinois.

With respect to the question of the citizenship of the class, the Court concludes that the record establishes by a preponderance of the evidence that well over two-thirds of the class are Illinois citizens.  As noted, this case has been pending since 2002 and because the case is at a procedurally advanced stage the parties have been able to furnish the Court with extremely specific information concerning the membership of the class.  Most importantly, BOE has supplied the Court with a spreadsheet setting out the name and the last known mailing address of each borrower in the class, as well as the amount of each loan the borrower has taken out from BOE; Kitson has supplied the Court with a substantially identical list of class members, doubtless compiled from BOE's

records, used by class counsel to give notice to the members of the class of the pendency of this action.  Both BOE's evidence and Kitson's evidence reflect that over ninety percent of class members have Illinois mailing addresses.  Additionally, Kitson points out that BOE is a relatively small operation that is headquartered in Madison County, Illinois, and maintains all of its branches in Madison County and neighboring St. Clair County, Illinois, that much of the Bank's loan portfolio is secured by property located in Madison County and St. Clair County, and that the Bank, as a community bank subject to regulation under the Community Reinvestment Act, 12 U.S.C. §§ 2901-2908, is required to invest in the area where it conducts business, that is, Madison County and St. Clair County.  *See* 12 U.S.C. § 2901.  Both BOE and HFS freely concede the overwhelming likelihood that substantially more than two-thirds of class members are Illinois citizens, but they insist that evidence of the Illinois mailing addresses of the vast majority of the borrowers in the class is not sufficient to show citizenship for diversity purposes.  The Court disagrees.

With respect to the natural persons in the class, their Illinois mailing addresses are some evidence of Illinois citizenship.  It is true of course that the citizenship of a natural person for diversity purposes is determined by the person's domicile, *see Gilbert v. David*, 235 U.S. 561, 569 (1915); *Pollution Control Indus. of Am., Inc. v. Van Gundy*, 21 F.3d 152, 155 n.4 (7th Cir. 1994); *Williams v. Versto, Inc.*, No. 96 C 6427, 1996 WL 745338, at *1 (N.D. Ill. Dec. 27, 1996); *Seaboard Fin. Co. v. Davis*, 276 F. Supp. 507, 509 (N.D. Ill. 1967), which means the state where the person is physically present with an intent to remain there indefinitely.  *See Perry v. Pogemiller*, 16 F.3d 138, 140 (7th Cir. 1993); *Cassens*, 430 F. Supp. 2d at 833; *O'Neal v. Atwal*, 425 F. Supp. 2d 944, 946 (W.D. Wis. 2006); *Broadwater v. Heidtman Steel Prods., Inc.*, 300 F. Supp. 2d 671, 672 (S.D. Ill.

2003).  Although as BOE and HFS point out, evidence of residence in Illinois is insufficient to prove domicile there, it nonetheless creates a rebuttable presumption of domicile in Illinois.  *See District of Columbia v. Murphy*, 314 U.S. 441, 455 (1941) ("The place where a man lives is properly taken to be his domicile until facts adduced establish the contrary."); *Ennis v. Smith*, 55 U.S. (14 How.) 400, 423 (1853) ("Where a person lives, is taken *primâ facie* to be his domcil, until other facts establish the contrary."); *Shelton v. Tiffin*, 47 U.S. (6 How.) 163, 185 (1848) ("Where an individual has resided in a State for a considerable time, being engaged in the prosecution of business, he may well be presumed to be a citizen of such State, unless the contrary appear.").  *Cf. Sadat v. Mertes*, 615 F.2d 1176, 1181 (7th Cir. 1980) (quoting Restatement (Second) of Conflict of Laws § 19 (1971)) ("A domicil once established continues until it is superseded by a new domicil."); *McDonald v. Equitable Life Ins. Co. of Iowa*, 13 F. Supp. 2d 1279, 1281 (M.D. Ala. 1998) ("[O]nce an individual has established a domicile, he remains a citizen there until he satisfies the mental and physical requirements of domicile in a new state."); *Bair v. Peck*, 738 F. Supp. 1354, 1356 (D. Kan. 1990) ("[C]ourts have allowed a presumption of domicile upon proof of residency.").  In this case neither BOE nor HFS has put before the Court evidence that the class members who are natural persons are not domiciled at their Illinois mailing addresses, and therefore the Court is entitled to assume that they are.

Concerning class members that are legal persons, that is, business entities, as a general rule a corporation is for diversity purposes a citizen of the state where it is incorporated and the state where it maintains its principal place of business, that is, the "nerve center" where the corporation's executive headquarters is located.  *See* 28 U.S.C. § 1332(c)(1); *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7th Cir. 1991); *Jackson v. American Coal Co.*, No.

Civ.05-4166-JLF, 2006 WL 181682, at *1 (S.D. Ill. Jan. 23, 2006); *Elmhurst Consulting, LLC v. Gibson*, 219 F.R.D. 125, 126-27 (N.D. Ill. 2003).[3]  In this instance the evidence furnished by BOE shows that the businesses that borrow from it are small businesses – construction companies, small retailers, and so forth – who borrow small amounts, in some instances as little as a few thousand dollars.  It defies belief that the mailing addresses set out in BOE's records for these companies are not the addresses of their principal places of business.  *See Colon Muntaner v. Chart House Enters. of P.R.*, 848 F. Supp. 314, 316 (D.P.R. 1993) (holding that Puerto Rico was the principal place of business of a restaurant situated there, rather than Louisiana, where the restaurant's parent corporation maintained its principal place of business, because "[a] restaurant is not the type of operation which can be managed from over two thousand miles away.").

The Court recognizes that the evidence before it regarding the citizenship of the class is not perfect, but the record is not required to be perfect.  All that Kitson must show is that it is more likely than not that over two-thirds of the members of the class are Illinois citizens, and the Court believes he has met this burden.  Tellingly, at the hearing on Kitson's motion for remand, counsel for HFS openly admitted the overwhelming likelihood that well over two-thirds of class members are Illinois citizens:

---

3.    CAFA specifically provides that the citizenship of an unincorporated association is tested under essentially the same standard as a corporation.  "For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized."  28 U.S.C. § 1332(d)(10).  This of course is a legislative repeal of judicial construction of the diversity statute holding that the citizenship of an unincorporated association is the citizenship of its members.  *See Carden v. Arkoma Assocs.*, 494 U.S. 185, 197 (1990); *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 692 (7th Cir. 2003); *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998); *Intercon Constr., Inc. v. Southeast Directional Drilling, L.L.C.*, No. 04-C-225-C, 2004 WL 1447776, at *1 (W.D. Wis. June 23, 2004).

> Now we can speculate for good reasons – and if we were business people I'd say [it's] a pretty damn good speculation 94 percent of the people have an Illinois address.  Chances are you're going to come up with two-thirds unless things are dramatically different than we believe they would be and our experience teaches us.

Transcript of Hearing on Motion for Remand at 15.  It certainly is the case that the Court could order discovery with respect to the citizenship of the class.  *See Schwartz v. Comcast Corp.*, No. Civ.A. 05-2340, 2005 WL 1799414, at *7 (E.D. Pa. July 28, 2005).  The class in this case is relatively small, and affidavits identifying the jurisdictional prerequisites pertinent to each class member no doubt could be produced.  If the record were less clear concerning the citizenship of the class, the Court very likely would require discovery on the issue, given that the Court must abstain from hearing this case if the elements of the local controversy exception are satisfied.  The Court notes further that, even were it to conclude at this juncture that Kitson had not met his burden with respect to the citizenship of the class, this would not be the end of the matter because Kitson would be entitled to re-urge abstention upon further discovery with respect to the citizenship of the class. *See Hart*, 457 F.3d at 682 (affirming a district court's holding that the plaintiffs had failed to show the applicability of the local controversy or home-state exceptions, but holding that "Hart and the plaintiffs have the right, through appropriate discovery, to explore the facts relevant to the [district] court's jurisdiction as the case progresses.").  The Court sees no advantage to anyone in deferring a ruling on the citizenship of the class until further discovery in this case inevitably produces the clear and convincing evidence that over ninety percent of the class are Illinois citizens demanded by BOE and HFS.  The Court is satisfied that the record shows by a preponderance of the evidence that over two-thirds of the class are citizens of Illinois, so that the requirements of 28 U.S.C. § 1332(d)(4)(A)(i)(I) are met.

Turning then to the issue of whether the "principal injuries" at issue in this case were incurred in Illinois, 28 U.S.C. § 1332(d)(4)(A)(i)(III), the Court finds that Kitson has met his burden of proof on this element of the local controversy exception.  CAFA does not define the term "principal injuries."  However, "[t]he cardinal rule is that words used in statutes must be given their ordinary and plain meaning" and courts "frequently look to dictionaries to determine the plain meaning of words." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).  *See also Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 731 (7th Cir. 2005) (relying on Black's Law Dictionary to define the term "prepaid legal services" as used in the Employee Retirement Income Security Act of 1974); *Carmichael v. Payment Ctr., Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)) ("Without a statutory definition, we construe [a] term [of a statute] 'in accordance with its ordinary or natural meaning,' a meaning which may be supplied by a dictionary.").  *Cf. United States v. Knott*, 256 F.3d 20, 28 (1st Cir. 2001) (where terms are not defined in a statute, courts typically read statutory terms to convey their ordinary meaning, including as reflected in dictionary definitions); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1177 (Fed. Cir. 1993) ("It is a basic principle of statutory interpretation . . . that undefined terms in a statute are deemed to have their ordinarily understood meaning.  For that meaning, we look to the dictionary.") (citation omitted).

According to a leading legal dictionary, "principal" in its adjectival sense means "[c]hief; primary; most important," while an "injury" means "[t]he violation of another's legal right, for which the law provides a remedy; a wrong or injustice." Black's Law Dictionary (8th ed. 2004).  The injury at issue in this case is wrongly-computed interest on loans extended to commercial borrowers by BOE in Illinois.  It is undisputed that BOE selected the manner in which interest on the loans was

computed, although HFS is alleged to have aided and abetted BOE's alleged misconduct in wrongfully computing such interest through HFS's proprietary software, Laser Pro, which BOE allegedly used to generate the loan documents for some of the transactions at issue. Obviously, the primary liability for the injury belongs to BOE. *See Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 859 (Ill. 1998) (explaining that liability for aiding and abetting a violation of the ICFA is "secondary liability" for which the statute, in defining the conduct prohibited thereunder, furnishes no liability); Ronald M. Lepinskas, *Civil Aiding and Abetting in Illinois*, 87 Ill. B.J. 532, 533 (1999) (explaining that liability for aiding and abetting is "[a] [d]istinct [f]orm of [s]econdary [l]iability"). The record shows that the loans were extended by BOE in Illinois and that the rate at which interest was computed on the loans was selected by the bank, without any control by HFS. In fact it is quite likely that, under the law of this Circuit, Kitson's claims against HFS for aiding and abetting must be dismissed, because the Seventh Circuit holds that, absent evidence of a conspiratorial agreement, Illinois law does not recognize a tort of aiding and abetting. *See Renovitch v. Kaufman*, 905 F.2d 1040, 1049 (7th Cir. 1990); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 452-53 (7th Cir. 1982). In sum, the principal injuries at issue in this case were incurred in Illinois.

BOE and HFS urge the Court to interpret the statutory term "principal injuries" in light of the legislative history of CAFA, specifically, a report by the Senate Judiciary Committee regarding CAFA which states:

> The third criterion [of the local controversy exception] is that the principal injuries resulting from the actions of all the defendants must have occurred in the state where the suit was filed. By this criterion, the Committee means that all or almost all of the damage caused by defendants' alleged conduct occurred in the state where the suit was brought. The purpose of this criterion is to ensure that this exception is used only where the impact of the misconduct alleged by the purported class is

localized.  For example, a class action in which local residents seek compensation for property damage resulting from a chemical leak at a manufacturing plant in that community would fit this criterion, provided that the property damage was limited to residents in the vicinity of the plant.  However, if the defendants engaged in conduct that could be alleged to have injured consumers throughout the country or broadly throughout several states, the case would not qualify for this exception, even if it were brought only as a single-state class action.

S. Rep. No. 109-14, at 40 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3, 38.  The Judiciary Committee report offers the following example of a class action in which the "principal injuries" should not be deemed local:

A class action is brought in Florida against an out-of-state automobile manufacturer and a few in-state dealers, alleging that a certain vehicle model is unsafe because of an allegedly defective transmission.  The vehicle model was sold in all fifty states but the class action is only brought on behalf of Floridians.  This case would not fall within the Local Controversy Exception for two reasons.  First, the automobile dealers are not defendants whose alleged conduct forms a significant basis of the claims or from whom significant relief is sought by the class.  Even if the plaintiffs are truly seeking relief from the dealers, that relief is just small change compared to what they are seeking from the manufacturer.  Moreover, the main allegation is that the vehicles were defective.  In product liability cases, the conduct of a retailer such as an automobile dealer does not form a significant basis for the claims of the class members.  Second, the case falls outside the Local Controversy Exception because the "principal injuries resulting from the alleged conduct," – i.e., selling a vehicle with a defective transmission – were incurred in all fifty states.  The fact that the suit was brought as a single-state class action does not mean that the principal injuries were local.  In other words, this provision looks at where the principal injuries were suffered by everyone who was affected by the alleged conduct – not just where the proposed class members were injured.  Thus, any defendant could remove this case to federal court.

S. Rep. No. 109-14 at 41, *reprinted in* 2005 U.S.C.C.A.N. at 39.

The Court finds reliance on the Judiciary Committee report to interpret CAFA problematical for several reasons.  First, resort to legislative history is appropriate only if a statute is ambiguous.  *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 125 S. Ct. 2611, 2626 (2005) ("[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material.  Extrinsic

materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."); *Garcia v. United States*, 469 U.S. 70, 76 n.3 (1984) (quoting *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 396 (1951) (Jackson, J., concurring)) ("Resort to legislative history is only justified where the face of the Act is inescapably ambiguous[.]"); *United States v. Logan*, 453 F.3d 804, 805 (7th Cir. 2006) ("Even the plainest legislative history does not justify going against an unambiguous enactment."). The term "principal injuries" as used in CAFA is not ambiguous.  As has been discussed already, the natural and ordinary meaning of the term is that it refers to the chief or primary violation of legal rights complained of in a class action, in this instance BOE's allegedly improper computation of interest on loans extended to commercial borrowers by the bank in Illinois.  The Court sees no need for recourse to legislative history in interpreting the clear statutory language.  *See T.D. v. LaGrange Sch. Dist. No. 102*, 349 F.3d 469, 482 (7th Cir. 2003) (declining to rely upon legislative history that contradicted the plain language of a statute:  "Unless exceptional circumstances dictate otherwise, when we find the terms of a statute unambiguous, judicial inquiry is complete.").

Equally troubling is the fact that the Judiciary Committee report, which was issued ten days after the effective date of CAFA, is merely post-enactment legislative history, of little or no value in interpreting the statute.  As the leading treatise on statutory interpretation explains, "Post-enactment views of those involved with [the enactment of a statute] should not be considered when interpreting the statute . . . . While contemporaneous sponsor statements are frequently used as extrinsic aids to legislative intent, post enactment statements of legislators on legislative intent have been disapproved.  They are of limited legal value to an understanding [of] the clear meaning and legal effect of statutes."  2A Norman J. Singer, ed., *Sutherland on Statutory Construction*

§ 48:20 (6th ed. 2002) (collecting cases).  In *Covalt v. Carey Canada Inc.*, 860 F.2d 1434 (7th Cir. 1988), the court explained cogently the problems inherent in relying upon post-enactment legislative history as a tool of statutory interpretation:

> Legislative history is valuable only to the extent it reveals the background of the law and the assumptions shared by those who wrote and voted on the bills.  It is a contemporaneous record that helps a court reconstruct the meaning of our always-ambiguous language.  Statements and thoughts that not only did not but also could not have come to the attention of Congress at the time do not reveal the process of deliberations.  By definition, words written after the vote and the President's signature were uninfluential in the process leading to the vote.  That is why . . . subsequent legislative history . . . is not helpful as a guide to understanding a law . . . . Even the contemporaneous committee reports may be the work of those who could not get their thoughts into the text of the bill.

> * * * *

> Subsequent writings may be nothing but wishful thinking, and unless they are uttered as part of the process of enacting a later law (and therefore show assumptions on which Congress as a whole acted at least once) they are of no account.

*Id*. at 1438.  *See also Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2766 n.10 (2006) (giving no weight to statements inserted by lawmakers into the Congressional Record after floor debate on pending legislation); *Sullivan v. Finkelstein*, 496 U.S. 617, 632 (1990) (Scalia, J., concurring) ("Arguments based on subsequent legislative history . . . should not be taken seriously, not even in a footnote."); *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 407 (1987) (giving little weight to a statement by the sponsor of a law that was placed into the Congressional Record ten days after the law passed); *Resolution Trust Corp. v. Gallagher*, 10 F.3d 416, 421-22 (7th Cir. 1993) (in interpreting legislative intent, the court would not give substantial weight to a Senate report that was not published until two months after the Senate voted on a bill).  *Cf. In re Sinclair*, 870 F.2d 1340, 1343 (7th Cir. 1989) (noting that "legislative history is a poor guide to legislators' intent because it is written by the staff rather than by members of Congress, because it is often losers' history ('If you can't get your

proposal into the bill, at least write the legislative history to make it look as if you'd prevailed'),

[and] because it becomes a crutch ('There's no need for us to vote on the amendment if we can write

a little legislative history[.]')").

There is no reason to believe that the Judiciary Committee report on CAFA played any role

in shaping debate and consideration of the statute.  In fact, the text of the report states that it did not.

As Senator Patrick Leahy points out in his "Additional Views" in the report, the report was never

circulated to the Senate before the enactment of CAFA:

> The circulation and filing of this report occurred after passage of the legislation for
> Senate consideration of the underlying bill.  Indeed, it was filed after the House of
> Representatives passed this legislation and on the same day that the President signed
> the measure into law.  Committee reports, like Committee consideration of measures,
> are intended to assist the Senate in its consideration of the matter.  Committees tend
> to have Members with expertise and experience that help shape legislation for Senate
> consideration.  In this case, that did not occur.  Instead, at the insistence of the
> Republican leadership, this bill was rushed through the Judiciary Committee and
> then forced through the Senate without amendment.
>
> * * * *
>
> The Republican leadership's timetable was so short that there was no opportunity to
> prepare a Committee report before final passage.  There was no time for Senators to
> review a cost estimate from the Congressional Budget Office.  There was no
> evaluation of the regulatory impact of the bill.  That this report is being filed after
> Senate consideration means that it did not serve the principal purpose for which
> Committee reports are intended.

S. Rep. No. 109-14 at 79, *reprinted in* 2005 U.S.C.C.A.N. at 73.  Thus, it can hardly be said that the

Judiciary Committee report was instrumental in the "genesis and evolution" of CAFA.  *Continental*

*Can Co. v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund*,

916 F.2d 1154, 1157 (7th Cir. 1990) ("[S]tatements after enactment do not count; the legislative

history of a bill is valuable only to the extent it shows genesis and evolution, making 'subsequent

legislative history' an oxymoron.").

Indeed, the problem noted by the *Covalt* court, that subsequent legislative history may in fact be revisionist history, that is, "the work of those who could not get their thoughts into the text of the bill," 860 F.2d at 1438, seems particularly acute in the case of a statute like CAFA. The Judiciary Committee report recounts the long and bitterly-contested history of the statute's passage. According to the report, consideration of CAFA "began . . . in the 105th Congress" in 1997 with its introduction as a bill, but "[n]o further action was taken" in the 105th Congress. S. Rep. No. 109-14 at 1-2, *reprinted in* 2005 U.S.C.C.A.N. at 3-4. The bill was reintroduced in 1999 in the 106th Congress and reported favorably out of committee, but passage stalled again. *See* S. Rep. No. 109-14 at 2, *reprinted in* 2005 U.S.C.C.A.N. at 4. Although the bill was re-reintroduced in the 107th Congress and the Senate "continued consideration" of it, "[n]o further action was taken" on the bill in the 107th Congress. *Id*. In 2003 the bill got out of committee but was filibustered on the Senate floor, prompting the sponsors of the bill to "negotiate[ ]" with opponents of its "key provisions." *Id*. A compromise bill was introduced in 2004, but was again filibustered, which then led to introduction of Senate Bill No. 5, which eventually became CAFA. *See* S. Rep. No. 109-14 at 3, *reprinted in* 2005 U.S.C.C.A.N. at 4-5. Under these circumstances, it is very difficult to take at face value any claim that the Judiciary Committee report is a reliable account of the legislative intent underlying CAFA. *See American Hosp. Ass'n v. NLRB*, 899 F.2d 651, 657 (7th Cir. 1990) ("Post-enactment legislative history . . . is sometimes a sneaky device for trying to influence the interpretation of a statute, in derogation of the deal struck in the statute itself among the various interests represented in the legislature . . . . Courts must be careful not to fall for such tricks and thereby upset a legislative compromise.").

Finally, the Court concludes that the definition of "principal injuries" proffered by the

Judiciary Committee is not a meaning of the language of CAFA that can reasonably be inferred from the face of the statute.  As has been discussed, legislative history cannot defeat the plain meaning of a statute.  "Where words are susceptible of several meanings, the court is at liberty to determine from the legislative history and surrounding circumstances the sense in which the words were used in the statute.  However, where, as here, the interpretation urged . . . is not supported by common usage, dictionary definition, or court decision, such interpretation cannot be upheld."  *Torti v. United States*, 249 F.2d 623, 625 (7th Cir. 1957).  Likewise, "[i]t is well established that in interpreting the meaning to be given words used in legislative enactments the words are to be given their known and ordinary signification.  The obvious, plain and rational meaning is preferable to a narrow, strained, or hidden meaning."  *U.S. Gypsum Co. v. United States*, 253 F.2d 738, 744 (7th Cir. 1958) (citing, inter alia, *Old Colony R.R. Co. v. Commissioner*, 284 U.S. 552, 560 (1932)).  Had Congress intended for CAFA to be interpreted in the manner proposed in the Judiciary Committee report, it would have been simple enough to insert into the statute an express provision defining the term "principal injuries" in that manner.  It is well settled that "if Congress desired to have its own words given some special meaning it could have done so by including a definition of them in the act or possibly by saying that their words are subject to definition by appropriate administrative agencies," and where Congress does neither, then "congressional intent must be found in the commonly understood meaning of its words."  *United States v. Redmond*, 328 F.2d 707, 710-11 (6th Cir. 1964).  Moreover, "[i]f Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent . . . . It is beyond [the courts'] province to rescue Congress from its drafting errors, and to provide for what we might think is the preferred result."  *Lamie v. U.S. Trustee*, 540 U.S. 526, 542 (2004).

In the Court's view, a mere "opinion poll of legislators," as the Seventh Circuit recently termed the Judiciary Committee report, is too flimsy a basis upon which to interpret the language of CAFA in a manner so at odds with the plain meaning of that language.  *Brill*, 427 F.3d at 448. *Cf. Abrego*, 443 F.3d at 692 (declining to rely on the Judiciary Committee report to hold that a district court erred in refusing to permit jurisdictional discovery aimed at establishing the propriety of removal under CAFA where the portion of the report cited by the defendant was "untethered to any statutory language").  The natural and ordinary meaning of the term "principal injuries" for purposes of this case is the chief or primary violation of legal rights asserted by Kitson and the class, that is, BOE's allegedly improper computation of interest on loans extended to commercial borrowers by the bank in Illinois.  Therefore, the Court concludes that the principal injuries in this case were incurred in Illinois.  As to the remaining elements of the local controversy exception, the parties do not dispute, and the record shows, that BOE is a citizen of Illinois, the state where this action was originally filed, and that it is a Defendant from whom significant relief is sought whose alleged conduct forms a significant basis for the claims asserted.  *See* 28 U.S.C. § 1332(d)(4)(A)(i)(II)(aa)-(cc).  Finally, it is undisputed that no other class action has been filed against BOE or HFS asserting the "same or similar factual allegations" during the three-year period preceding the filing of this class action.  28 U.S.C. § 1332(d)(4)(A)(ii).  The Court concludes that, in light of the law and facts of this case and the record developed therein, abstention from the exercise of federal jurisdiction is required under the local controversy exception to CAFA. Therefore, this case will be remanded to state court.

### 3.    Home-State Exception

As a last matter, the Court addresses the question of whether abstention is appropriate in this

case pursuant to 28 U.S.C. § 1332(d)(4)(B), the home-state exception to CAFA.  Under this exception, a district court shall decline jurisdiction where "[t]wo-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed." 28 U.S.C. § 1332(d)(4)(B).  As discussed in the preceding section of this Order, the Court already has determined that the record in this case shows by a preponderance of the evidence that well over two-thirds of the class are Illinois citizens.  Therefore, the question for the Court to resolve is whether the "primary defendants" in this case are Illinois citizens as well.

The term "primary defendants" is not defined in CAFA.  However, it is axiomatic that Congress is assumed to act with the knowledge of existing law and interpretations when it enacts new legislation.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 792 (1998) (noting the "presumption that Congress was aware of [prior] judicial interpretations [of a statute] and, in effect, adopted them"); *North Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995) (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 699 (1979)) (in interpreting new legislation enacted by Congress, "it is not only appropriate but also realistic to presume that Congress was thoroughly familiar with [federal court] precedents . . . and that it expect[s] its enactment[s] to be interpreted in conformity with them."); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ("[W]e do not lightly assume that Congress has intended to depart from established principles" created through judicial decisions); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation."); *United States v. Martin*, 128 F.3d 1188, 1192 (7th Cir. 1997) (in construing amendments to a statute, a court presumes that Congress was aware of judicial interpretations of the statute); *Martin v. Luther*, 689 F.2d 109, 115 (7th Cir. 1982)

("Congress is presumed to know the law."). *Cf. Garcia v. Department of Homeland Sec.*, 437 F.3d 1322, 1336 (Fed. Cir. 2006) ("Congress is presumed to enact legislation with knowledge of the law and a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts.") (collecting cases); *Board of County Comm'rs v. EEOC*, 405 F.3d 840, 845 (10th Cir. 2005) ("We assume that Congress knows the law and legislates in light of federal court precedent."); *United States v. LeCoe*, 936 F.2d 398, 403 (9th Cir. 1991) ("Congress is, of course, presumed to know existing law pertinent to any new legislation it enacts.").

In the particular context of CAFA, this means that the statute is presumed to have been enacted with knowledge of existing law and judicial decisions and does not overrule such law and decisions except to the extent it does so explicitly. *See Brill*, 427 F.3d at 448 (CAFA does not repeal the traditional rule that a defendant seeking removal to federal court has the burden of proving the existence of federal subject matter jurisdiction). *See also Frazier*, 455 F.3d at 547 (noting that CAFA evinces "an intent to change nothing about the statutory meaning of 'citizen'" for purposes of diversity jurisdiction); *In re General Motors Corp. Dex-Cool*, No. Civ. MDL-03-1562-GPM, Civ. 05-10008-GPM, 2006 WL 2818773, at *5 (S.D. Ill. Sept. 27, 2006) (CAFA must be construed consistently with the rule that a notice of removal may not be amended more than thirty days after the time for removal to include new allegations of federal jurisdiction not asserted in the original notice). Indeed, "[g]iven the care taken in CAFA to reverse *certain* established principles but not others, the usual presumption that Congress legislates against an understanding of pertinent legal principles has particular force." *Abrego*, 443 F.3d at 684 (emphasis in original).

As already has been discussed, because the liability of HFS is predicated solely on aiding and abetting alleged wrongdoing by BOE, the bank is the only "primary defendant" in this case.

Page 26 of  32

In *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), the court concluded that the live-in companion of a burglar could be held civilly liable for a murder committed by the burglar during a break-in on theories of conspiracy and aiding and abetting the burglar's criminal activities. The court observed that "[t]he primary issues raised by this appeal are what kind of activities of a secondary defendant [the live-in companion] will establish vicarious liability for tortious conduct . . . by the primary wrongdoer [the burglar], and to what extent will the secondary defendant be liable for another tortious act . . . committed by the primary tortfeasor while pursuing the underlying tortious activity." *Id*. at 476. The court noted that both conspiracy and aiding and abetting are theories of "concerted tortious action," that is, devices for imposing "vicarious liability for concerted action" by making tortfeasors who commit a joint tort liable for one another's acts. *Id*. at 476-77. The court defined the elements of a conspiracy as: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Id*. at 477. The court set out the elements of aiding and abetting as follows: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id*.

The *Halberstam* court explained that "[t]he prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity. Aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful

conduct." 705 F.2d at 478 (quoting Restatement (Second) of Torts § 876(b) (1979)).  The court

outlined other distinctions between conspiracy and aiding and abetting:

> Courts and commentators have frequently blurred the distinction between the two
> theories of concerted liability.  Most commonly, courts have relied on evidence of
> assistance to the main tortfeasor to infer an agreement, and then attached the label
> "civil conspiracy" to the resultant amalgam.  Sometimes, although not always, the
> inference has been factually justified; many tort defendants have both conspired with
> and substantially assisted each other.  But we find it important to keep the
> distinctions clearly in mind as we review the facts in this novel case to see if tort
> liability is warranted on either or both concerted action theories.  For the distinctions
> can make a difference.  There is a qualitative difference between proving an
> *agreement to participate* in a tortious line of conduct, and proving *knowing action*
> that substantially aids tortious conduct.  In some situations, the trier of fact cannot
> reasonably infer an agreement from substantial assistance or encouragement.  A
> court must then ensure that all the elements of the separate basis of aiding-abetting
> have been satisfied . . . .  Furthermore, it is difficult to conceive of how a conspiracy
> could establish vicarious liability where the primary wrong is negligence, but a
> secondary defendant could substantially aid negligent action.  The theory of liability
> also affects who is liable for what.  An aider-abettor is liable for damages caused by
> the main perpetrator, but that perpetrator, absent a finding of conspiracy, is not liable
> for the damages caused by the aider-abettor.

*Id.* (footnote omitted) (emphasis in original).  Also, the court noted, "substantial assistance" such

as to create liability for aiding and abetting can be "distant in time and location" from the primary

wrongdoing.  *Id.* at 482.

In *Passa v. Derderian*, 308 F. Supp. 2d 43 (D.R.I. 2004), which involved consolidated claims

arising from a fire at a nightclub that killed and injured hundreds of people, the court construed the

Multiparty, Multiforum, Trial Jurisdiction Act of 2002 ("MMTJA"), 28 U.S.C. § 1369, a statute with

some important similarities to CAFA.  Like CAFA, MMTJA amended 28 U.S.C. § 1332, giving

federal courts subject matter jurisdiction in diversity over litigation arising from accidents that cause

the deaths of more than seventy-five persons, provided that minimal diversity of citizenship exists.

*See* 28 U.S.C. § 1369(a).  MMTJA contains a provision for mandatory abstention worded similarly

to the home-state exception in CAFA:

> Limitation of jurisdiction of district courts. – The district court shall abstain from hearing any civil action described in subsection (a) in which –
> (1) the substantial majority of all plaintiffs are citizens of a single State of which the primary defendants are also citizens; and
> (2) the claims asserted will be governed primarily by the laws of that State.

28 U.S.C. § 1369(a).  As with CAFA, the term "primary defendants" is not defined in MMTJA.  The *Passa* court's manner of interpreting the term for purposes of MMTJA is instructive in interpreting the same term for purposes of the home-state exception under CAFA.

Importantly, the *Passa* court declined to define "primary defendants" under MMTJA as "those defendants with the 'deepest pockets.'"  308 F. Supp. 2d at 61.  This position seems sound to the Court; it is easy to imagine the arbitrary and unfair results, for plaintiffs and defendants alike, if a "primary defendant" for purposes of either MMTJA or CAFA were always the wealthiest defendant in a case, however peripheral that defendant's relationship to the wrongdoing at issue may have been.  The *Passa* court likewise refused to define "primary defendants" based on the relative share of liability held by particular defendants, reasoning that such determinations could not be made in the absence of discovery or even a full trial on the merits, at which time, of course, liability would be definitively apportioned by the trier of fact:

> [I]t has been argued that this Court should consider those defendants that are most culpable for the nightclub fire as "primary defendants."  However, at such an early stage in the court proceedings, before either discovery or a trial on the merits, it becomes difficult, if not impossible, for this writer to assign either culpability or liability for the tragic events of February 20, 2003.  To utilize this standard as a baseline, the Court would be forced to reserve ruling on abstention until the issues of liability were resolved.  As a result, it is an unworkable standard, and this writer declines to adopt it.

*Id*. at 61-62.  Instead, the court looked to traditional judicial understandings of the term "primary defendants" to elicit its meaning for purposes of the statute.  *See id*. at 62.

The *Passa* court's survey of relevant authorities reveals a settled judicial understanding of "primary defendants" as "those parties having a 'dominant relation to the subject matter of the controversy,'" in contrast to defendants who played a secondary role by merely assisting alleged wrongdoing.  308 F. Supp. 2d at 62 (quoting *United States v. American Tobacco Co.*, 221 U.S. 106, 143 (1911)).  *See also Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 650 (3$^d$ Cir. 1998) (dividing the defendants in an action under the Racketeer Influenced and Corrupt Organizations Act into "primary defendants," defined as alleged participants in racketeering activity, and "secondary defendants," defined as alleged aiders and abettors); *Sims v. Chesapeake & Ohio Ry. Co.*, 520 F.2d 556, 559 (6th Cir. 1975) (discussing the liability of a "primary defendant" and a "secondary defendant" in the context of indemnification); *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1443 (S.D. Cal. 1988) ("In large and complicated securities fraud actions such as this, courts must be especially attentive to a plaintiff's 'dragnet' tactic of indiscriminately grouping all of the individual defendants into one wrongdoing monolith.  Such a tactic often fails to take account of the law's separate treatment of primary wrongdoers and secondary wrongdoers . . . . [I]t is insufficient under Rule 9(b) [of the Federal Rules of Civil Procedure] to . . . group . . . the defendants together without differentiating who might be primarily liable and who might be secondarily liable."); *Marrero v. Banco di Roma (Chicago)*, 487 F. Supp. 568, 572 (E.D. La. 1980) (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94 (5th Cir. 1975)) (using the terms "primary" and "secondary" defendants to separate those primary parties alleged to have improperly purchased and sold securities from secondary defendants having only a "legally cognizable relationship" to the plaintiffs, including "corporate insiders, tippers and tippees, consultants, conspirators, and aiders and abettors"); Restatement (Second) of Torts § 886B cmt. c (discussing the concept of "primary"

and "secondary" responsibility in the context of indemnification); 4 Am. Jur. 2d *Appellate Review* § 112 (1964 & Supp. 2006) (under a contribution order, a joint tortfeasor is liable to the "primary defendant" for any amount paid over a stated sum).

Ultimately the *Passa* court concluded that "primary defendants" for purposes of MMTJA are "those parties that are allegedly directly liable to the plaintiffs, while 'secondary' defendants are . . . those parties sued under theories of vicarious liability or joined for purposes of contribution or indemnification." 308 F. Supp. 2d at 62 (citing *Halberstam*, 705 F.2d at 476). Thus, the court held, "the most appropriate definition of 'primary defendants' in the context of [MMTJA] must include those parties facing direct liability in the instant litigation." *Id*. at 62-63. The court explained that "all defendants sued directly in a cause of action maintain a dominant relationship to the subject matter of the controversy, while those parties sued under theories of vicarious liability, or joined for purposes of indemnification or contribution, maintain an indirect or 'secondary' relationship to the litigation." *Id*. at 62. The court noted that its interpretation of the term "primary defendants" for purposes of the statute was the definition most consistent not only with traditional legal concepts but also judicial economy and fairness to parties, because "it does not require the Court to make a pre-trial determination of liability or culpability, but rather requires only a review of the complaint to determine which defendants are sued directly." *Id*. at 63.

The Court finds *Passa* persuasive in construing the term "primary defendants" for purposes of CAFA. In this case, HFS's liability is entirely vicarious, that is, HFS is alleged to have aided and abetted wrongful conduct by BOE by supplying the bank with propriety software for the purpose of generating loan documents. As the *Halberstam* court explained, whether this claim is construed as one for conspiracy or one for aiding and abetting, the essential theory is the same, that is, making

HFS vicariously and jointly liable for the actions of BOE.  Although case law from both the Seventh Circuit Court of Appeals and the Supreme Court of Illinois raises substantial doubt as to whether Kitson can impose any such secondary liability on HFS, this is not the Court's concern at this juncture.  The Court concludes that this is an action in which two-thirds or more of the members of the class in the aggregate and the primary Defendant, BOE, are citizens of Illinois, where this action originally was filed, so that abstention is required under the home-state exception to CAFA.  *See* 28 U.S.C. § 1332(d)(4)(B).

### CONCLUSION

It is hereby **ORDERED** that the motion to remand brought by Plaintiff Kenneth Kitson, individually and on behalf of others similarly situated, is **GRANTED** (Doc. 14).  This action is **REMANDED** to the Circuit Court of the Twentieth Judicial Circuit, St. Clair County, Illinois, pursuant to 28 U.S.C. § 1447(c).  The Clerk of Court is **DIRECTED** to mail a certified copy of this Order to the clerk of the state court and to close the file in this case.

**IT IS SO ORDERED.**

DATED:  11/22/06


s/ *G. Patrick Murphy*
G. PATRICK MURPHY
Chief United States District Judge